**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STANDARD GENERAL L.P., on behalf of itself and its insured subsidiaries and affiliated hedge funds, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) **COMPLAINT** ) |
| HARTFORD ACCIDENT AND INDEMNITY COMPANY, | ) **JURY TRIAL DEMANDED** ) |
| Defendant. | ) ) ) |

Plaintiff Standard General L.P. ("Standard General"), by and through its undersigned counsel, for its Complaint against Defendant Hartford Accident and Indemnity Company ("Hartford"), alleges as follows:

## PRELIMINARY STATEMENT

1.      This is an action for declaratory relief and damages for breach of contract, arising out of Hartford's breach of its obligations under an excess "follow-form" insurance policy sold to Standard General by Hartford (the "Hartford Excess Policy").

2.      In direct violation of its contractual obligations to Standard General, Hartford has neither advanced nor reimbursed Standard General for its Defense Costs in connection with various lawsuits arising in connection with the termination by American Apparel Inc. ("American Apparel") of its CEO, Dov Charney, American Apparel's bankruptcy, and the bankruptcy of RadioShack Corporation ("RadioShack").  Those lawsuits include:

   a. *Charney v. Standard General, L.P. et al*, Case No. 586119 (Los Angeles Super. Ct.) (the "California Action");

      b.   *Standard General L.P., Standard General Master Fund L.P., P Standard General Ltd., v. Charney,* No. 1287-B (Del. Chancery Ct.) (the "Delaware Action");

      c.   *Salus Capital Partners, LLC, in its capacity as Agent v. Standard Wireless Inc. et at.,* No. 15-10197 (BLS) (D. Del. 2015) (the "Salus Action");

      d.   *Official Committee of Unsecured Creditors of RadioShack Corporation, et al., v. Soohyung Kim, et al.,* No. 15cv00652-A (Bankr. N.D. Tex 2015) (the "UCC Action");

      e.   *Rodriguez v. Mayer,* C.A. No. 10944-CB (Del. Chancery Ct.) (the "Rodriguez Action");

      f.   *Vaughn v. Standard General L.P. et al.*, Index No. 0653918/2015 (Sup. Ct. New York County, N.Y) (the "Vaughn Action");

(The above-referenced lawsuits, together with any related actions, writs and appeals, are referred to herein collectively as the "Underlying Lawsuits").

      3.   Continental Casualty Company ("CNA"), the primary insurer, has paid the full limit of liability with respect to costs incurred in all the Underlying Lawsuits under the primary insurance policy to which the Hartford Excess Policy follows form (the "CNA Primary Policy"). Hartford, however, contends that two of these actions, the Salus Action and the Delaware Action, are not covered by the CNA Primary Policy.  According to Hartford, when the costs of the Underlying Lawsuits, excluding the Delaware Action and the Salus Action, are aggregated, the CNA Primary Policy limits of liability have not been exhausted.

      4.   This position is inconsistent with terms of the CNA and Hartford Policies and constitutes a breach of Hartford's coverage obligations.

      5.   The Delaware Action arose in connection with Standard General's defense of the California action and involved the same factual circumstances and claims.  Indeed, the purpose of the filing of the Delaware Action was to obtain a stay of the California Action and to defend

against and resolve the core issues in the California Action in Delaware, a more favorable forum for Standard General and the forum required under the contracts.  This strategy was successful, resulting in a stay of the California Action, and an early judgment in Standard General's favor based on Standard General's motion for judgment on the pleadings.

6.      Despite the defensive nature of the Delaware Action, Hartford denied coverage for the Delaware Action on the ground that it was an affirmative lawsuit and the CNA Primary Policy did not cover affirmative claims.

7.      Hartford also denied coverage for the Delaware Action on the ground that Standard General impaired its subrogation rights by agreeing to reimburse CNA with any funds it obtained in the Delaware Action, despite the fact that the subrogation provision on which Hartford relies is only implicated if the Insurer has covered the Loss in question.  Further, Standard General has not obtained any funds in the Delaware Action that would implicate the subrogation provision, further undermining Harford's reliance on this provision as a basis for denying coverage.

8.      Hartford contended that the Salus Action was not covered by the CNA Primary Policy because it arose from contractual liability and, therefore, was barred by an exclusion in the CNA Primary Policy.

9.      The Salus Action, however, implicated numerous theories of liability, including that Standard General was "grossly negligent."  The Salus Action also contained numerous non-contractually dependent allegations.  Further, Standard General was not even a party to the contracts relied on by Hartford.

10.     The Defense costs incurred in the Underlying Lawsuits, including the Delaware and Salus Actions, exceed the limits of liability of the CNA Primary Policy, and implicate the entirety, or very shortly will implicate the entirety, of Hartford's $5 million layer of coverage.

11.     Standard General has complied with all conditions and requirements to obtain coverage under the Hartford Excess Policy, and the CNA Primary Policy to which it follows form, and Hartford's denial of coverage constitutes a breach of its coverage obligations.

12.     Because Hartford has improperly denied coverage for these actions based on inapplicable exclusions and policy language, Standard General has been forced to bring this action to obtain coverage under the Hartford Excess Policy it purchased.

## PARTIES

13.     Plaintiff Standard General is a limited partnership organized under the laws of New York with its principal place of business in New York that provides investment services. None of its general or limited partners are citizens of Connecticut.[1]

14.     Defendant Hartford is a Connecticut Corporation with its principal place of business in Hartford, Connecticut.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.  This action is between citizens of different States, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

16.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b).

---

[1] None of the Standard General Subsidiaries or affiliated Hedge Funds identified herein are incorporated in Connecticut, have principal places of business in Connecticut or have general partners that are citizens of Connecticut.

## FACTUAL BACKGROUND

### A.   THE INSURANCE POLICIES

17.   In consideration of the payment of substantial premiums to cover precisely the type of claims at issue here, CNA and Hartford sold Standard General claims-made coverage insuring Standard General for claims brought against Insureds during the Policy Period from September 1, 2014 through September 1, 2015, or for claims based on allegations that are the same as or related to claims made during that period.  A copy of the CNA Primary Policy No. 425207388, is attached hereto as Exhibit A.

18.   The CNA Primary Policy provides broad and comprehensive coverage for liability arising from investment advising and hedge fund management.  It has a $5 million limit of liability and self-insured retentions of $0, $150,000, or $200,000 depending on the particular coverage part.

19.   The CNA Primary Policy identifies Standard General as the "Named Insured" and extends coverage to "Subsidiaries" of Standard General as well as to specific Hedge Funds.[2]

20.   The Hartford Excess Policy provides the first layer of excess coverage to Standard General, in excess of the CNA Primary Policy limits of liability and a self-insured retention.  The Hartford Excess Policy has a $5 million limit of liability.  A copy of the Hartford Excess Policy is attached hereto as Exhibit B.

21.   The Hartford Excess Policy No. 425207388 "follows form" to the CNA Primary Policy, meaning that, aside from attachment points and limits of liability (and unless otherwise

---

[2] The CNA Primary Policy defines "Subsidiary" as an entity in which Standard General has direct or indirect "Management Control" which, in turn, is defined as owning interests representing 50% of the voting, appointment or designation power to the selection of a majority of: the Board of Directors of a corporation; the management committee members of a joint venture; or the members of the management board or a limited liability company, the general partners of a limited liability partnership or the partnership managers of a general partnership.

specified), the Hartford Excess Policy incorporates and adopts the terms, conditions, definitions

and exclusions of the CNA Primary Policy, including those discussed immediately below.

22.     The CNA Primary Policy includes three applicable "Insuring Agreements":  (1)

Investment Adviser Professional Liability Coverage Part ("Insuring Agreement I"), (2)

Investment Adviser Management Liability Coverage Part ("Insuring Agreement II"), and (3)

Hedge Fund Management and Professional Liability Coverage Part ("Insuring Agreement III").

23.     With respect to all three Insuring Agreements, "Claim" is defined to include

> (1)  a written demand for monetary damage or non-monetary relief (including a request to toll or waive a statute of limitations or for injunctive or declaratory relief);

> (2) a civil or criminal proceeding, any alternative dispute resolution proceeding or an Extradition[.]

24.     With respect to all three Insuring Agreements, "Loss" is defined to include:

"those amounts that any Insured is legally obligated to pay as awards, settlements, judgments

(including any award of pre-judgment and post-judgment interest on a covered judgment), [and]

Defense Costs…."

25.     "Defense Costs" is defined under all three Insuring Agreements as: "reasonable

and necessary fees, costs, expenses, consented to by the Insurer (such consent not to be

unreasonably withheld) and incurred by an Insured in the investigation, adjustment, defense or

appeal of any covered Claim…."

26.     Insuring Agreement I provides coverage for "Loss on behalf of an Insured

resulting from any Claim first made against such Insured during the Policy Period… for a

Wrongful Act by such Insured…."

27.     "Wrongful Act" is defined in Insuring Agreement I as "any actual or alleged error, misstatement, misleading statement, act, omission, neglect or breach of duty committed or attempted by an Insured in rendering, or failing to render Professional Services."

28.     "Professional Services" is defined in Insuring Agreement I as including:

(1) financial, economic or investment advice regarding investments in securities;

(2) investment management, portfolio management and asset allocation services performed;
…
for and on behalf of a … customer or client….

29.     Insuring Agreement II provides coverage for "Loss [on behalf of an Insured Entity] resulting from any Claim first made against the Insured Entity…for a Wrongful Act."

30.     "Wrongful Act" is defined in Insuring Agreement II  as "any actual or alleged error, misstatement, misleading statement, act, omission, neglect or breach of duty committed or attempted by…an Insured Entity[.]"

31.     "Insured Entity"  is defined in Insuring Agreement II as the "Investment Advisor" which, in turn, is defined in the CNA Primary Policy's General Terms and Conditions as the "Named Insured and any Subsidiary."

32.      Insuring Agreement III provides coverage for "Loss on behalf of the Hedge Fund Insureds resulting from any Claim first made against any Hedge Fund Insured during the Policy period…for a Wrongful Act."

33.     "Wrongful Act" is defined in Insuring Agreement III as "any actual or alleged error, misstatement, misleading statement, act, omission, neglect or breach of duty committed or attempted…by a Hedge Fund in its capacity as such[.]"

34.     "Hedge Fund Insureds" is defined in Insuring Agreement III as "any Hedge Fund," which is further defined in Endorsement 7 to the CNA Primary Policy as including: (1)

Standard General Master Fund L.P., (2) Standard General Focus Fund L.P., and (3) Standard General O.C. Master Fund L.P.

35.     The CNA Primary Policy also contains a mandatory mediation provision, which bars commencement of a civil action until after completion of the initial mediation session, or until 45 days after the date of the filing of the written request for mediation.  Here, a written request for mediation was made on June 4, 2018.  Thus, this condition of the CNA Primary Policy has been satisfied.

36.     The CNA Primary Policy also contains a subrogation provision pursuant to which an insurer, "[t]o the extent it pays Loss…shall be subrogated to all the Insureds' rights of recovery."

## B.     THE UNDERLYING LAWSUITS

### (i)     The Charney California and Delaware Actions

37.     In June 2014, the Board of Directors of American Apparel terminated Dov Charney, its founder, from his position as Chief Executive officer ("CEO") based upon alleged misconduct and breaches of his fiduciary duties.

38.     Shortly after Charney's termination, Standard General loaned Charney $19.6 million pursuant to a Letter Agreement for the purpose of increasing Charney's share of American Apparel stock to approximately 43% of outstanding shares.  The newly purchased shares would serve as collateral for the loan.

39.     In July 2014, Charney, American Apparel and Standard General entered into a Nomination, Standstill, and Support Agreement (the "Standstill Agreement") pursuant to which a majority of the Board (including Charney) would be replaced by five new board members – three

of which would be selected by Standard General and two of which would be nominated by

Standard General and approved by American Apparel.

40.     The Standstill Agreement established a process for a committee of the new board

members called the Suitability Committee to investigate Charney's alleged misconduct and

determine whether to reinstate Charney as CEO.  The Standstill Agreement also documented

Standard General's commitment to loan up to $25 million to American Apparel.

41.     The Standstill Agreement further provided that Delaware courts would have

exclusive jurisdiction over any dispute relating to the agreement or the contemplated

transactions.

42.     In December 2014 the Suitability Committee decided not to reinstate Charney as

CEO, and he was terminated for cause.

43.     On or about June 3, 2015 Charney filed the California Action, in which he sought

to invalidate the Standstill Agreement, and various other related agreements entered into by

Charney and Standard General.[3]  The defendants in the lawsuit were Standard General; Standard

General Master Fund L.P., an entity identified as an insured Hedge Fund in the CNA Primary

Policy; P Standard General Ltd., a Standard General Subsidiary as that term is defined in the

CNA Primary Policy; American Apparel; and six American Apparel officers and directors.

44.     Charney alleged in the California Action that he only agreed to borrow money

from Standard General to purchase shares of American Apparel stock because Standard General

assured him that its ultimate goal was to have Charney reinstated as CEO.  Charney further

alleged that he only entered into the Standstill Agreement because Standard General assured

---

[3] These related agreements include: a Cooperation Agreement, a Warrant Agreement, a Credit
Agreement, a Notes Agreement, and a Pledge Agreement (collective the "Underlying
Agreements").

Charney that it would support him and that the process outlined in the Standstill Agreement would result in him being CEO.

45.     The Complaint alleged nine causes of action including fraud, negligent misrepresentation, breach of fiduciary duty, rescission, conspiracy, intentional and negligent infliction of emotional distress, and declaratory relief.

46.     On or about July 11, 2015, Standard General and its Subsidiaries/affiliated Hedge Funds that were named as defendants in the California Action, filed the Delaware Action.  The Complaint in the Delaware Action sought to enforce the same Underlying Agreements that were at issue in the California Action and centered on the exact same factual circumstances.

47.     The Delaware Action was filed defensively in order to (1) lay the groundwork for and increase the likelihood of obtaining a stay in the California Action, and (2) resolve the allegations in the California Action in a more favorable forum to Standard General and thereby defeat the California Action.  Specifically, if Standard General could enforce the terms of the Underlying Agreements in the Delaware Action, it would necessarily defeat Charney's claims in the California Action relating to those same agreements.

48.     The Delaware Action asserted the following causes of action:  (1) declaratory judgment that the Underlying Agreements were enforceable and that Charney failed to perform under those agreements, (2) breach of contract, (3) breach of the implied covenant of good faith and fair dealing, and (4) impairment of collateral.

49.     On June 22, 2016, Charney filed an Answer in the Delaware Action in which he raised 11 affirmative defenses. These affirmative defenses were largely based on the same allegations in Charney's Complaint in the California Action.  The Delaware Chancery Court

noted that Charney advanced these issues solely as affirmative defenses and deliberately chose not to file any counterclaims because he wished to pursue these claims in the California Action.

50.     Standard General's strategy of defensively shifting the litigation to Delaware was resoundingly successful.

51.     On December 22, 2015, the California Superior Court granted Standard General's motion for a stay of the California Action.  The Court specifically noted that it would be "unduly inefficient and burdensome on the courts and the parties to allow the case to proceed on a different schedule in California," which was direct acknowledgment that one basis for granting the stay was the pendency of the Delaware Action.

52.     On December 19, 2018, the Delaware Chancery Court granted Standard General's motion for judgment on the pleadings.

**(ii)     The RadioShack Actions**

53.     In December 2013 two lender groups, the asset-based lenders  (the "ABL Lenders"), and a group of lenders led by Salus Capital Partners, LLC (the "SCP Lenders") extended over $800 million in financing to RadioShack, with the goal of increasing its liquidity and helping it to avoid bankruptcy.  These loans were secured by liens on RadioShack's assets.

54.     The ABL and SCP Lenders entered into individual Credit Agreements with RadioShack, as well as an Intercreditor Agreement with each other in order to establish their rights and liabilities, particularly regarding priority for receiving repayment on their secured loans.

55.     In October 2014 the ABL Lenders assigned their loans to a new group of ABL Lenders, including certain Standard General affiliates.  The new ABL Lenders reduced the amount of the loan commitment pursuant to an amendment to their Credit Agreement.

56.     Despite this financing, in February 2015, RadioShack filed for bankruptcy under Chapter 11 of the Bankruptcy Code in the United States District Court for the District of Delaware (the "Bankruptcy Proceeding").

57.     In March 2015, the Committee of Unsecured Creditors (the "Committee") appointed in the Bankruptcy Proceeding sought permission from the bankruptcy court to access certain of the debtor's privileged documents in the context of its investigation into the October 2014 transaction.  In support of its request, the Committee submitted an outline of potential claims, including potential claims against Standard General, such as equitable subordination based on inequitable conduct, and breach of fiduciary duty.

58.     On March 17, 2015 Salus Capital Group, LLC ("Salus"), filed the Salus Action against various defendants including (1) Standard General, (2) General Retail Holdings, L.P., a Subsidiary of Standard General as that term is defined in the CNA Primary Policy, and (3) General Retail Funding LLC, a Subsidiary of Standard General as that term is defined in the CNA Primary Policy (collectively, the "Salus Defendants").  Salus filed an Amended Complaint on May 22, 2015.

59.     According to the Amended Complaint in the Salus Action, the October 2014 restructuring of the ABL Lenders' loan was part of a scheme to "manipulate the market for credit default swaps" ("CDS").  Specifically, the Amended Complaint alleged that certain of the Salus Defendants had issued credit default swap protection on RadioShack bonds such that if RadioShack defaulted on its debt prior to December 20, 2014, these defendants would have suffered massive losses.  Accordingly, the Salus Defendants engaged in the October 2014 restructuring to avoid such losses and keep RadioShack out of bankruptcy until after the December 20, 2014 deadline, to the detriment of RadioShack's other creditors.

60.     The Amended Complaint alleged, in part, that this conduct was "grossly negligent, reckless or willful misconduct."[4]

61.     On August 31, 2015, the Committee filed the UCC Action against various defendants including (1) Soohyung Kim, the Managing Partner and Chief Investment Officer of Standard General (2) Standard General (3) General Retail Holdings, L.P., (4) General Retail Funding LLC, (5) Standard General Master Fund L.P., an entity identified as an insured Hedge Fund in the CNA Primary Policy (6) Standard General OC Master Fund L.P., an entity identified as an insured Hedge Fund in the CNA Primary Policy, (7) P Standard General Ltd., a Subsidiary of Standard General as that term is defined in the CNA Primary Policy, and (8) Standard General Focus Fund L.P., an entity identified as an insured Hedge Fund in the CNA Primary Policy (the "UCC Defendants").[5]

62.     The UCC Action alleged, in sum and substance, that Standard General, with the complicity of RadioShack's CEO, engaged in a scheme designed to allow Standard General to acquire and control RadioShack's senior debt in October 2014, and delay an inevitable bankruptcy, to the benefit of Standard General and the detriment of other creditors.

## C.     CNA AGREES TO COVER DEFENSE COSTS BUT HARTFORD DENIES COVERAGE

63.     Standard General provided notice to CNA of the Underlying Lawsuits.

64.     Although CNA initially reserved its rights, it ultimately paid its full $5,000,000 limit of liability in connection with the Underlying Lawsuits.

---

[4] In an Opinion dated May 11, 2016, the Court dismissed the Complaint for failing to state a claim upon which relief could be granted.
[5] On September 30, 2015, the UCC Action was resolved by a court-approved settlement in the Bankruptcy Proceeding.

65.     Standard General provided timely notice of the Underlying Lawsuits to Hartford and/or Hartford was otherwise aware of these lawsuits.

66.     In correspondence dated October 13, 2017, Hartford acknowledged that the CNA Primary Policy appeared applicable to the California Action, the UCC Action, the Vaughn Action, and the Rodriguez Action.

67.     Nevertheless, Hartford took the position that the Delaware Action and the Salus Action were not covered under the CNA Primary Policy.

68.     Hartford contended that because the Delaware Action was an affirmative lawsuit it was not covered by the CNA Primary Policy.  Hartford reiterated this position in a letter dated January 24, 2018.

69.     Hartford further contended that the Delaware Action was not covered because Standard General had impaired Hartford's subrogation rights by agreeing to CNA's request that it give "priority to CNA as to any affirmative recovery to Standard from first dollar until we are made whole for Defense Costs."  That provision, however, is expressly premised on the insurer paying Loss, which Hartford has not done.

70.     Moreover, Standard General's agreement with CNA was solely with respect to the Delaware Action – in which it has not recovered any funds and has not made any payments to CNA.  Thus, Hartford's subrogation rights could not have been impaired.

71.     Also in its October 13, 2017 letter, Hartford contended that coverage for the Salus Action was barred by an exclusion in the CNA Primary Policy because the Action arose out of contract liability.

72.     Hartford further contended that the Salus Action was not covered because the CNA Primary Policy only provided coverage for a Wrongful Act and, according to Hartford, the

Salus action arose from "pre-existing contractual obligations, rather than damages resulting from a Wrongful Act."

73.     In the Salus Action, however, only two out of nine causes of action asserted contractual claims and Standard General was not a party to those contracts.   Further, the Salus Complaint makes numerous non-contractually-dependent allegations, such as that the defendants in that action, including Standard General, were "grossly negligent, reckless or [engaged in] willful misconduct."

74.     Because, according to Hartford, the Salus Action and Delaware Action were not covered by the CNA Primary Policy, Hartford contends that the defense costs incurred by Standard General with respect to the remaining Underlying Lawsuits (in addition to the Shareholder Actions), were insufficient to exhaust the limits of liability of the CNA Primary Policy and, thus, Hartford's Excess Policy layer has not been reached.

## FIRST CAUSE OF ACTION
### (Declaratory Relief – Duty to Pay Defense Costs Related to the American Apparel Actions)

75.     Standard General repeats and re-alleges the allegations set forth in the preceding paragraphs 1-74 of this Complaint as if fully set forth herein.

76.     Pursuant to the terms of the Hartford Excess Policy and the CNA Primary Policy to which it follows form, Hartford agreed to pay Defense Costs which Standard General, its Subsidiaries, and specified Hedge Funds became obligated to pay because of a covered Claim made against those entities.

77.     Pursuant to the terms of the Hartford Excess Policy and the CNA Primary Policy to which it follows form, a Claim includes:  "a written demand for monetary damage or non-monetary relief," and a "civil or criminal proceedings…."

78.     Pursuant to the terms of the Hartford Excess Policy and the CNA Primary Policy to which it follows form, Defense Costs include: "reasonable and necessary fees, costs, and expenses, consented to by the insurer (such consent not to be unreasonable withheld) and incurred by an Insured in the investigation, adjustment, defense or appeal of any covered Claim…."

79.     Pursuant to the Hartford Excess Policy and the CNA Primary Policy to which it follows form, the Underlying Lawsuits are covered Claims.

80.     Pursuant to the Hartford Excess Policy and the CNA Primary Policy to which it follows form, Standard General's fees and costs incurred in the Delaware Action, the California Action, the Vaughn Action and the Rodriguez Action (the "American Apparel Actions") constitute covered Defense Costs.

81.     Hartford's obligation to pay Standard General's unreimbursed Defense Costs is not exempted by any exclusion in the CNA Primary Policy or Hartford Excess Policy.

82.     Standard General has fully complied with all terms, conditions and prerequisites to coverage set forth in the Hartford Excess Policy, or has been excused from compliance with such terms, conditions or prerequisites as a result of Hartford's breach(es) and/or other conduct.

83.     Hartford has failed to fulfill its obligation to pay Standard General's Defense Costs incurred by Standard General in the American Apparel Actions, subject to the Hartford Excess Policy attachment point and limit of liability.

84.     The controversy between Standard General and Hartford is ripe for judicial decision.  A justiciable controversy exists between the parties regarding the existence and scope of Hartford's obligations under the Hartford Excess Policy to pay Standard General's Defense Costs incurred in the American Apparel Actions.

85.     Pursuant to 28 U.S.C. § 2201, the Court should enter a declaratory judgment in favor of Standard General and against Hartford, declaring that Hartford is obligated to pay Standard General's Defense Costs incurred in the American Apparel Actions, subject to the Hartford Excess Policy's applicable attachment point and limit.

## SECOND CAUSE OF ACTION
**(Declaratory Relief – Duty to Pay Defense Costs Related to the RadioShack Actions)**

86.     Standard General repeats and re-alleges the allegations set forth in the preceding paragraphs 1-85 of this Complaint as if fully set forth herein.

87.     Pursuant to the terms of the Hartford Excess Policy and the CNA Primary Policy to which it follows form, Hartford agreed to pay Defense Costs which Standard General, its Subsidiaries, and specified Hedge Funds became obligated to pay because of covered Claims made against those entities.

88.     Pursuant to the terms of the Hartford Excess Policy and the CNA Primary Policy to which it follows form, a Claim includes:  "a written demand for monetary damage or non-monetary relief," and a "civil or criminal proceedings…."

89.     Pursuant to the terms of the Hartford Excess Policy and the CNA Primary Policy to which it follows form, Defense Costs include: "reasonable and necessary fees, costs, and expenses, consented to by the insurer (such consent not to be unreasonable withheld) and incurred by an Insured in the investigation, adjustment, defense or appeal of any covered Claim…."

90.     Pursuant to the Hartford Excess Policy and the CNA Primary Policy to which it follows form, the UCC Action and the Salus Action (the "RadioShack Actions") are covered Claims.

91.     Pursuant to the Hartford Excess Policy and the CNA Primary Policy to which it follows form, Standard General's fees and costs incurred in the RadioShack Actions constitute covered Defense Costs.

92.     Hartford's obligation to pay Standard General's unreimbursed Defense Costs is not exempted by any exclusion in the CNA Primary or Hartford Excess Policies.

93.     Standard General has fully complied with all terms, conditions and prerequisites to coverage set forth in the Hartford Excess Policy, or has been excused from compliance with such terms, conditions or prerequisites as a result of Hartford's breach(es) and/or other conduct.

94.     Hartford has failed to fulfill its obligation to pay Standard General's Defense Costs incurred by Standard General in the RadioShack Actions, subject to the Hartford Excess Policy attachment point and limit of liability.

95.     The controversy between Standard General and Hartford is ripe for judicial decision.  A justiciable controversy exists between the parties regarding the existence and scope of Hartford's obligations under the Hartford Excess Policy to pay Standard General's Defense Costs incurred in the RadioShack Actions.

96.     Pursuant to 28 U.S.C. § 2201, the Court should enter a declaratory judgment in favor of Standard General and against Hartford, declaring that Hartford is obligated to pay Standard General's Defense Costs incurred in the RadioShack Actions, subject to the Hartford Excess Policy's applicable attachment point and limit.

### **THIRD CAUSE OF ACTION**
**(Breach of Contract – Duty to Pay Defense Costs for the American Apparel Actions)**

97.     Standard General repeats and re-alleges the allegations set forth in the preceding paragraphs 1-96 of this Complaint as if fully set forth herein.

98.     The Underlying Lawsuits are covered Claims.

99.     Pursuant to the Hartford Excess Policy and the CNA Primary Policy to which it follows form, Standard General's fees and costs incurred in the American Apparel Actions constitute covered Defense Costs.

100.     Hartford's obligation to pay these Defense Costs is not exempted by any exclusion in the CNA Primary Policy or Hartford Excess Policy.

101.     The CNA Primary Policy's limit of liability and any self-insured retention underlying the Hartford Excess Policy have been exhausted by reason of payment of covered Defense Costs incurred by Standard General.

102.     Standard General has fully complied with all terms, conditions and prerequisites to coverage set forth in the Hartford Excess Policy, or has been excused from compliance with such terms, conditions or prerequisites as a result of Hartford's breach(es) and/or other conduct.

103.     Subject to the Hartford Excess Policy's attachment point, Hartford has a duty to advance and pay Standard General for unreimbursed Defense Costs incurred in the American Apparel Actions, which do, in fact, exceed the Hartford Excess Policy's attachment point.

104.     Hartford breached its obligation to pay Standard General's Defense Costs incurred in the American Apparel Actions, which exceed the Hartford Excess Policy's attachment point.

105.     As a result of Hartford's breach of its obligation to pay Standard General's Defense Costs resulting from the American Apparel Actions, subject to the Hartford Excess Policy's attachment point, Standard General has suffered damages in an amount to be determined at trial, but no less than $75,000, exclusive of interest and costs.

## FOURTH CAUSE OF ACTION
### (Breach of Contract – Duty to Pay Defense Costs for the RadioShack Actions)

106.     Standard General repeats and re-alleges the allegations set forth in the preceding paragraphs 1-105 of this Complaint as if fully set forth herein.

107.     The Underlying Lawsuits are covered Claims.

108.     Pursuant to the Hartford Excess Policy and the CNA Primary Policy to which it follows form, Standard General's fees and costs incurred in the RadioShack Actions constitute covered Defense Costs.

109.     Hartford's obligation to pay these Defense Costs is not exempted by any exclusion in the CNA Primary Policy or Hartford Excess Policy.

110.     The CNA Primary Policy's limit of liability and any self-insured retention underlying the Hartford Excess Policy have been exhausted by reason of payment of Covered Defense Costs incurred by Standard General.

111.     Standard General has fully complied with all terms, conditions and prerequisites to coverage set forth in the Hartford Excess Policy, or has been excused from compliance with such terms, conditions or prerequisites as a result of Hartford's breach(es) and/or other conduct.

112.     Subject to the Hartford Excess Policy's attachment point, Hartford has a duty to advance and pay Standard General for unreimbursed Defense Costs incurred in the RadioShack Actions, which do, in fact, exceed the Hartford Excess Policy's attachment point.

113.     Hartford breached its obligation to pay Standard General's Defense Costs incurred in the RadioShack Actions, which exceed the Hartford Excess Policy's attachment point.

114.     As a result of Hartford's breach of its obligation to pay Standard General's Defense Costs resulting from the RadioShack Actions, subject to the Hartford Excess Policy's

attachment point, Standard General has suffered damages in an amount to be determined at trial, but no less than $75,000, exclusive of interest and costs.

## PRAYER FOR RELIEF

WHEREFORE, Standard prays for relief as follows:

(a) On the First Cause of Action, Standard requests that the Court enter a declaratory judgment in favor of Standard General and against Hartford, declaring that Hartford is obligated to pay Standard General's Defense Costs incurred in connection with the American Apparel Actions, including the Delaware Action, subject to the Hartford Excess Policy's attachment point in an amount to be determined in this action.

(b) On the Second Cause of Action, Standard requests that the Court enter a declaratory judgment in favor of Standard General and against Hartford, declaring that Hartford is obligated to pay Standard General's Defense Costs incurred in connection with the RadioShack Actions, including the Salus Action, subject to the Hartford Excess Policy's attachment point in an amount to be determined in this action.

(c) On the Third Cause of Action, Standard General requests that the Court enter judgment against Hartford, awarding Standard General compensatory and consequential damages in an amount to be determined in this action;

(d) On the Fourth Cause of Action, Standard General requests that the Court enter judgment against Hartford, awarding Standard General compensatory and consequential damages in an amount to be determined in this action;

(e)  On all Causes of Action, Standard General requests that the Court award Standard General all costs incurred as a consequence of having to prosecute this lawsuit, including attorneys' fees, as well as prejudgment and post-judgment interest; and

(f)  Additionally, on all Causes of Action, Standard General requests such other and further relief as the Court deems just and proper.

## JURY DEMAND

Standard General hereby demands a trial by jury on all issues so triable.

McKool Smith, P.C.

By: _____

   Robin L. Cohen
   (rcohen@mckoolsmith.com)
   Adam S. Ziffer
   (aziffer@mckoolsmith.com)
   Jillian M. Raines
   jraines@mckoolsmith.com

   One Bryant Park, 47th Floor
   New York, NY 10036
   Telephone: (212) 402-9400
   Facsimile:  (212) 402-9444

   *Attorneys for Plaintiff Standard General*
   *Corporation*

Dated: July 19, 2018